**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Case No. _____ |
| | ) | |
| DAVID GREENBERG, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**BRIEF IN SUPPORT OF THE UNITED STATES' PETITION TO ENFORCE
INTERNAL REVENUE SERVICE SUMMONS**

The United States of America submits this brief in support of its petition to enforce an administrative summons, which the Internal Revenue Service served on Respondent David Greenberg, in connection with an investigation of James Rhodes. As detailed below, the United States' petition and the Declarations of Revenue Agents Thomas Roginski and Stephen Ng establish a *prima facie* case for enforcement of the summons. The Court, therefore, should order Mr. Greenberg to show cause why the summons should not be enforced.

STATEMENT OF FACTS

This matter arises from the IRS' investigation of the sale of a resort hotel in Hawaii for $158 million and the abusive tax-shelter transactions that the IRS believes took place afterward to shield the income on the sale from federal income tax.

In summary, Pan Global Partners ("PGP") indirectly owned 86.66 percent of the assets of a resort hotel, the Hilton Waikoloa Village. In 2002, PGP sold its interests in the hotel to a subsidiary of Hilton Hotels Corporation named Hilton Waikoloa LLC. PGP received $158 million — including $78 million in cash and $80 million of Hilton Corporation stock — for the sale of its partnership interest. (Roginski Decl. ¶ 6.)

PGP was partly owned by Helstan U.S. Holdings Corporation & Subsidiaries ("Helstan"). Helstan, through several subsidiaries, held an interest in PGP, and thus the hotel. (Attachment A to Revenue Agent Roginski's declaration is an organizational chart that shows the ownership structure of PGP, Helstan, and the resort hotel through several tiers of corporations and partnerships.) Instead of reporting $158 million in income upon the sale of the hotel, PGP reported a loss of $43,417. (*Id.* ¶ 7.) As explained below, the IRS believes that Mr. Greenberg played a role in the execution of the tax-shelter transactions that resulted in this loss.

For example, during the IRS' audit of PGP's 2002 income tax return, IRS counsel conducted an interview of Steve Corbin, the accountant who prepared the Helstan and PGP tax returns. When questioned about the loss of $43,417 on PGP's return, Mr. Corbin informed the IRS: (a) that he had no idea how the $43,417 loss was generated; (b) that all of PGP's return's figures had been given to him by Respondent David Greenberg; and, (c) that he did not request any explanation from Mr. Greenberg for the figures on PGP's tax return. (*Id.* ¶ 8.)

The IRS believes that a certain family, the Koos family, which held controlling stakes in the various partnerships and corporations, acting through their various foreign and U.S. agents, engaged in what the IRS calls an intermediary transaction as part of sheltering the income from the $158 million sale from taxation. (*Id.* ¶ 9.) The IRS has listed intermediary transactions as abusive tax shelters.[2]

---

[2] An intermediary transaction is a listed tax shelter designed to avoid corporate-level taxes in the disposal of a corporation and its assets. *See* IRS Notices 2001-16 and 2008-111, available at http://www.irs.gov/businesses/corporations/article/0,,id=120633,00.html#11 and http://www.irs.gov/pub/irs-drop/n-08-111.pdf. In a typical intermediary transaction, either the shareholders of the target corporation (or a buyer interested in acquiring the corporate assets) arranges for a third party to acquire the stock and then sell the assets out of the acquired corporation. The stock seller generally obtains a premium price for the stock and the asset buyer may obtain a step up in basis in the corporate assets it would not otherwise enjoy if it purchased stock instead of assets. In some situations the tax shelter will be arranged between the stock seller and the promoter, and the asset buyer will not be involved in the transaction. The deal is structured so that the corporation avoids tax on the gain realized from the sale.

The IRS believes that promoters and accommodation parties that executed this shelter included:  Respondent David Greenberg, then a partner at the "Big Four" accounting firm KPMG; James Rhodes (the subject of this investigation) and Harry Zelnick through their LLCs, Browning Road Trading Two LLC and River Run Financial Services LLC; Steve Acosta[3] through OR Acquisitions II LLC; and, various law firms, including the firm of Lee, Goddard & Duffy, LLP.  (*Id.* ¶ 10.)

Based on other information in its possession, the IRS also believes that the PGP loss may have been partly generated by a Short Option Strategy ("SOS") transaction Mr. Greenberg may have executed — the second suspected tax shelter employed to minimize PGP's reported income from the sale of the hotel.  The IRS has also listed the SOS as an abusive tax-shelter transaction.[4]  The Service has been unable to identify anyone other than Mr. Greenberg who may have information with respect to the amounts reported on the PGP tax return.  (*See id.* ¶¶ 11-12.)

James Rhodes, whose liability as a transferee of Helstan is the subject of the summons at issue, received a cash distribution of $1,914,014 from the sale of the resort hotel.  The ongoing investigation is into the liability of James Rhodes as a transferee of assets of Helstan for its unpaid income taxes.  (*Id.* ¶¶ 2, 13.)  Under certain circumstances, transferee liability may be imposed against a transferee of property when the IRS is unable to collect taxes owed by the property's transferor.  *See, e.g.*, 26 U.S.C. § 6901.  Here, Mr. Rhodes may be liable as a transferee of property from transferor, Helstan U.S. Holdings Corporation & Subsidiaries.

Specifically, as part of its transferee investigation of Mr. Rhodes, the IRS might need to demonstrate that the SOS loss generated for PGP was in fact substantively artificial and lacked

---

[3] In January, 2007, Steve Acosta, a former KPMG CPA, pled guilty to being part of a criminal tax conspiracy with various KPMG employees between 1999 and 2005, as well as to tax evasion in connection with tax shelters he executed with Respondent David Greenberg.  *See* discussion *infra*, p. 10.

[4] *See* IRS Notice 2000-44 – Son of Boss.  The IRS takes the position that the SOS transaction is a slight variation of the Son of Boss shelter, which is a listed abusive tax transaction.

economic substance. (*Id.* ¶ 14.) Without a doubt, Mr. Greenberg is well versed in the SOS transaction scheme, having been indicted in 2005 for, *inter alia*, conspiracy to design, market, and implement various tax shelters, including the SOS shelter, and for tax evasion. Importantly, while a jury acquitted Mr. Greenberg of those charges at the conclusion of his trial, it is clear that Mr. Greenberg is intimately familiar with the SOS transaction, and might provide information to the IRS regarding the transaction's lack of economic substance. *See* discussion, *infra* pp. 4-6, 10-12.

Mr. Greenberg may also have information that would demonstrate that Mr. Rhodes was *aware* that the suspected two tax-shelter transactions — the intermediary transaction and the SOS — lacked economic substance. Mr. Rhodes' knowledge is important to the IRS' investigation, as it may be a required component before assessing Mr. Rhodes as a transferee. (Roginski Dec. ¶ 15.)

Pursuant to the investigation of Mr. Rhodes, on October 25, 2010, Revenue Agent Stephen Ng, after consultation with Agent Roginski, issued an administrative summons directing Mr. Greenberg to produce for examination books, papers, records, and other information and to provide testimony as described in the summons. (Ng Decl. ¶ 3.) Revenue Agent Ng personally served the summons on Mr. Greenberg on October 25, 2010. (*Id.* ¶ 4.)

*Stein* Superseding Indictment

On October 17, 2005, Mr. Greenberg was named as a defendant in a Superseding Indictment the United States filed against him and 18 other defendants in the Southern District of New York. All defendants were affiliated with, formerly affiliated with, or did business with the "Big Four" accounting firm KPMG. (Superseding Indictment, *United States v. Stein, et al.*, 10/17/05) ("*Stein* Indictment") (attached as Exhibit 4).

Count One of the indictment alleged a conspiracy among the defendants from at least 1996 through at least 2005 to participate in a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters, by filing and causing to be prepared false U.S. individual income tax returns, and by fraudulently concealing those tax shelters from the IRS, all in violation of 18 U.S.C. § 371.  (*Stein* Indictment at 62.)  Count Two of the indictment alleged that Mr. Greenberg and 15 of his other co-defendants willfully attempted to evade and defeat a substantial part of the income tax owed by 39 of their unnamed tax-shelter clients for the years 1999 and 2000, including for three of Mr. Greenberg's unnamed clients, in violation of I.R.C. § 7201.  (*Id.* at 66.)

Specifically, with respect to the SOS tax shelter, between 1998 and 2002, the alleged conspiracy involved at least 165 unnamed, wealthy individuals who generated at least $1.9 billion in phony tax losses, for which KPMG received fees of at least $17 million.  On December 18, 2008, a jury acquitted Mr. Greenberg of all charges.[5]  (*See* Judgment of Acquittal, *United States v. David Greenberg*, 05-cr-00888-19-LAK, DE 1406) (attached as Exhibit 5).

Since being acquitted, Mr. Greenberg has testified in two Tax Court cases regarding SOS transactions — *Bergmann v. Commissioner*, Docket No. 20894-05, (T.C. 2010) and his own Tax Court trial, *Greenberg, et al. v. Commissioner*, Docket No. 1143-05, (T.C. 2011).  During the *Greenberg* trial, Mr. Greenberg testified in detail with respect to losses claimed on his personal tax return related to a tax-shelter transaction involving option trades — a transaction extraordinarily similar to the tax-shelter transactions Mr. Greenberg promoted while working for

---

[5] On August 28, 2008, the Second Circuit upheld the district court's dismissal of criminal charges against 13 of Mr. Greenberg's co-defendants, on the ground that the prosecutors had unjustifiably interfered with these defendants' ability to mount a defense by pressuring KPMG to refrain from paying their legal fees.  *See United States v. Stein*, 541 F.3d 130 (2nd Cir. 2008).  This decision left four defendants, including Mr. Greenberg, to face trial on the remaining conspiracy and tax evasion charges.  While Mr. Greenberg was acquitted on both counts, each of Mr. Greenberg's remaining three co-defendants was convicted of multiple counts of tax evasion.

KPMG, for which he was indicted in *Stein*, and the suspected SOS shelter at issue in this matter. (*See infra*, pp. 11-12.)

On December 13, 2010, three days before Mr. Greenberg was to appear before the IRS pursuant to the summons, his attorney sent a letter to Agent Roginski stating that Mr. Greenberg was electing to "assert the Fifth Amendment in this matter both as to providing any testimony and as to the production of any documents" and, consequently, would not be appearing before the IRS on December 16, 2010. (*See* Dec. 13, 2010 letter from B. Patterson to T. Roginski, attached as Exhibit 3).

Not surprisingly, on December 16, 2010, Mr. Greenberg failed to appear at the IRS office, failed to give testimony, and failed to provide any responsive documents. Respondent's failure to comply with the summons continues to the present date. (*See* Roginski Decl. ¶ 5.)

## DISCUSSION

**1) Background**

Pursuant to 26 U.S.C. § 7602(a) the Secretary of Treasury is authorized to "examine any books, papers, records, or other data which may be relevant or material" in connection with collecting a tax liability. Moreover, the Secretary is empowered to issue summonses to compel persons in possession of such records or other data to appear and produce them, and to give testimony. 26 U.S.C. § 7602(a)(2). Courts — including the U.S. Supreme Court — have repeatedly and broadly construed section 7602 in light of its intended purpose of furthering effective tax investigations, and have rejected attempts to circumscribe the effective exercise of the IRS' summons power. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984); *United States v. Euge*, 444 U.S. 707, 715-716 (1980); *United States v. Bisceglia*, 420 U.S. 141, 146 (1975).

Generally, to obtain enforcement of an IRS summons, the government must establish that the summons: (1) is issued for a legitimate purpose; (2) seeks information relevant to that purpose; (3) seeks information that is not already within the IRS' possession; and, (4) satisfies all administrative steps required by the Internal Revenue Code.  *United States v. Powell*, 379 U.S. 48, 57-58 (1964).  The government "may satisfy its ***minimal*** burden by presenting the sworn affidavit of the agent who issued the summons attesting to these facts."  *United States v. Morse*, 532 F.3d 1130, 1132 (11th Cir. 2008) (citation omitted) (emphasis added).  The Eleventh Circuit has stated that the "government's burden of showing relevance in this context is slight.  If the information sought by an IRS summons 'might throw light upon the correctness of the taxpayer's return,' then it is deemed to be relevant."  *La Mura v. United States*, 765 F.2d 974, 981 (11th Cir. 1985) (citations and internal quotations omitted).

In this case, the attached Declarations of Revenue Agents Roginski and Ng establish that the summons was issued for the valid purpose of determining Rhodes' transferee liability.  In that regard, the IRS sought the testimony and documents in the summons in an effort to investigate the intermediary and SOS transactions in which Mr. Greenberg may have been involved.  The documents described in the summons may be relevant to determine whether the transactions Rhodes, transferee, engaged in lacked economic substance, and whether Rhodes was aware that the tax-shelter transactions lacked economic substance.  (Roginiski Decl. ¶¶ 10-16.)  Clearly, the documents and testimony sought from Mr. Greenberg may be relevant to the determination of whether the IRS may assess Rhodes as a transferee.  *See, e.g.*, 26 U.S.C. § 6901 (Transferee Liability); 28 U.S.C. § 3304 ("Federal Debt Collection Procedures Act").

The remaining *Powell* factors are also satisfied.  The IRS does not have the information already called for by the summons; indeed, the IRS believes Mr. Greenberg may be the ***only***

7

individual who can shed light on PGP's 2002 tax return.  (Roginiski Decl. ¶ 12.)  In addition, all administrative steps required by the Internal Revenue Code have been followed.  (*Id.* ¶ 19.)

### 2) **Mr. Greenberg's Assertion of His Fifth Amendment Right Against Self-Incrimination Is Improper and Unfounded**

Mr. Greenberg has refused to even appear, much less produce records or testify, as commanded by the summons based upon an improper Fifth Amendment claim.  Mr. Greenberg's claim is flawed for several reasons: (1) Mr. Greenberg is not entitled to invoke the Fifth Amendment by means of a blanket refusal to produce records or appear and testify, as he has done here; (2) the Double Jeopardy Clause would bar the United States from bringing any new charges against Mr. Greenberg in connection with his shelter activity during the time frame covered in his indictment, which includes the time periods and activities at issue here; (3) as recently as last year, Mr. Greenberg testified in his own Tax Court case, which involved the SOS shelter — thus, it is not credible that he "'has reasonable cause to apprehend danger' of criminal liability"; and, (4) regarding the production of documents, it is unlikely that such a production from Mr. Greenberg would fall within the protections provided by the Fifth Amendment.

The Fifth Amendment's privilege against self-incrimination "protects a person . . . against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391,409 (1976).  A taxpayer may invoke the privilege in response to an IRS summons, but only where the taxpayer "'has reasonable cause to apprehend danger' of criminal liability." *United States v. Argomaniz*, 925 F.2d 1349, 1353 (11th Cir. 1991) (internal citations omitted).  To invoke the privilege, a taxpayer "must provide more than mere speculative, generalized" fear of prosecution; rather, the taxpayer "must be faced with substantial and real hazards of self-incrimination." *United States v. Reis*, 765 F.2d 1094, 1096 (11th Cir. 1985) (per curiam).

8

a) <u>Greenberg Cannot Make a Blanket Assertion of Privilege</u>

First, it is axiomatic that a blanket assertion of the privilege and a blanket refusal to testify and produce records "will not support a fifth amendment claim." *Argomaniz*, 925 F.2d at 1356 (citing *United States v. Roundtree*, 420 F.2d 845, 852 (5th Cir. 1969)).  Instead, the summonsed party "must present himself with his records for questioning, and as to *each* question and *each* record elect to raise or not to raise the defense." *Id.* (emphasis added).

Here, Mr. Greenberg, by letter through his counsel, refused to appear at all before the IRS; accordingly, his invocation is improper *ab initio*, and the Court should order Mr. Greenberg to appear before the IRS.  (*See* Dec. 13, 2010 letter, attached as Exhibit 3.)

b) <u>Double Jeopardy Would Bar Any New Prosecution of Mr. Greenberg</u>

Even if Mr. Greenberg had appeared before the IRS and invoked his Fifth Amendment rights on a question-by-question basis, the invocation would still be inappropriate because the Constitution's Double Jeopardy Clause would bar any new prosecution of Mr. Greenberg for his activities surrounding the implementation of tax shelters in the 2002 time frame.  The Double Jeopardy Clause of the Fifth Amendment states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  The clause prohibits successive prosecutions, and "protects against a second prosecution for the same offense after acquittal." *United States v. Harvey*, 78 F.3d 501, 504 (11th Cir. 1996); *United States v. Dunbar*, 591 F.2d 1190, 1192 (5th Cir. 1979).  The two offenses must be, in law and in fact, the same offense. *United States v. Linetsky*, 533 F.2d 192, 197 (5th Cir. 1976).  When it comes to conspiracy charges, double jeopardy attaches when the following facts are similar:

> (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each

>    case, and (5) places where the events alleged as part of the conspiracy took place.

*Harvey*, 78 F.3d 501, 505 (11th Cir. 1996).  Here, there is no question that the *Stein* Indictment covers the shelter activity in which Mr. Greenberg may have been involved as part of the sale of the resort hotel:

- The *Stein* Superseding Indictment covers a vast conspiracy from in or about 1996 through in or about 2005, including Mr. Greenberg's shelter activities during that time.  (*Stein* Indictment ¶ 25.)  The transactions at issue in this summons occurred in 2002, within the time frame covered in Mr. Greenberg's earlier indictment.

- The co-conspirators include similar entities and individuals.  Most notably, the accounting firm KPMG, where Mr. Greenberg was a tax partner, was an unindicted coconspirator in *Stein*.  Sixteen of the defendants in the *Stein* Superseding Indictment were former KPMG partners, and one was a former KPMG senior manager.  (*Id.* at ¶ 1.)  Moreover, Steve Acosta, a former KPMG CPA, pled guilty in a separate case to being part of a criminal tax conspiracy with various KPMG employees, including David Greenberg, between 1999 and 2005, as well as to tax evasion, obstruction, and false statements all in connection with tax shelters he executed with Mr. Greenberg.  (*See* Information and Judgment in *United States v. Acosta*, 07-cr-00026-LAK, DE 4 (1/10/07) & DE 12 (7/31/09), attached collectively as Exhibit 6); (Acosta Decl., attached as Exhibit 7).  Mr. Acosta, and his entity, OR Acquisitions II LLC, were also directly involved with the transactions at issue in the sale of the resort hotel in 2002. (*See* Attachment A to Roginiski Decl.)  Furthermore, Mr. Acosta declared that, as part of his conspiracy to defraud the United States, he signed various documents as the president of OR Acquisitions, which were sent to him by the law firm Lee, Goddard & Duffy, LLP.  The IRS believes that Lee, Goddard & Duffy also played a role in at least one of the instant transactions involving the sale of the hotel property.  Thus, there is significant overlap of putative coconspirators.

- The offenses that were charged in the *Stein* Superseding Indictment — conspiracy to defraud the United States and tax evasion, in violation of 18 U.S.C. § 371, 26 U.S.C. § 7201 and 18 U.S.C. § 2 — are the same crimes for which Mr. Greenberg could, in theory, be indicted due to his activities in the instant transactions.  (*See Stein* Indictment at 62, 66.)

- With regard to overt acts, the indictment described Mr. Greenberg's involvement in SOS tax shelters, including selling the SOS shelter, issuing opinion letters on the transaction, and directing clients to establish entities and open bank accounts in preparation for various SOS transactions.  (*Stein* Indictment at 57, ¶ 78.cc and 59, ¶ 78.ll.)  These are likely the same actions Mr. Greenberg took regarding the shelters enacted as part of the sale of the hotel property.

c) <u>Mr. Greenberg's Voluntary Testimony in His Own Tax Court Case Demonstrates His Lack of "Reasonable Cause to Apprehend Danger of Criminal Liability"</u>

Mr. Greenberg's self-serving testimony in his own Tax Court case demonstrates that he no longer has a realistic fear of prosecution regarding his former tax-shelter activities for which he was indicted and acquitted. Indeed, in *Greenberg, et al. v. Commissioner*, Docket No. 1143-05, (T.C. 2011), Mr. Greenberg voluntarily answered questions regarding:

- his involvement in KPMG's tax practice;

- his involvement in advising clients regarding SOS shelters;

- his referring of clients to specific attorneys for a legal opinion regarding the SOS shelter;

- preparing tax opinions for KPMG clients engaging in SOS transactions;

- arranging for other KPMG partners to engage in SOS tax shelters;

- his preparation of various tax returns;

- his relationship with Lee, Goddard & Duffy, the same law firm believed to have been involved in the instant transaction; and,

- his involvement with Steve Corbin — the same accountant that the IRS had questioned earlier in this matter and who has pointed to Mr. Greenberg, specifically, as the individual who may be able respond to the IRS' instant inquiries. (*See* Exhibit 8, Tr. of *Greenberg* Proceedings, Vol. 5, at 631-694); (*supra*, pp. 7-8); (Roginski Decl. ¶ 8.)

Given Mr. Greenberg's very recent, voluntary, and voluminous testimony in his Tax Court case — the *Greenberg* testimony occurred in February, 2011 — he cannot credibly maintain that he still has a "reasonable cause to apprehend danger" of criminal liability.[6] *See Argomaniz*, 925 F.2d at 1353.

---

[6] Mr. Greenberg's testimony in the *Bergmann* Tax Court trial serves to further highlight that this Court should address any claim of fear of prosecution as suspect. In *Bergmann*, Mr. Greenberg initially refused to answer any questions by asserting his Fifth Amendment rights. (*See* Exhibit 9, Tr. of *Bergmann* Proceedings, at 130-31.) But after questioning the witness about his purported fear of an additional prosecution, the Court determined that Mr. Greenberg was not under criminal investigation, and directed him to answer questions under threat of contempt

11

    d) <u>Greenberg's Compliance with the Summonsed Documents Is Not a Testimonial Act of Incrimination, and Therefore the Summons Should Be Enforced as to the Production of Documents from Greenberg</u>

In terms of producing responsive documents, it is highly unlikely that Mr. Greenberg's compliance with the IRS summons could be considered a testimonial act sufficient to support a Fifth Amendment claim of self-incrimination. As an initial matter, the contents of voluntarily prepared business records — like the records sought here — are not protected by the Fifth Amendment privilege. *See United States v. Doe*, 465 U.S. 605, 610-612 (1984); (Greenberg Summons, Attachment B to Exhibit 2). And, absent any showing, the act of production in general is not a "testimonial" act sufficient to warrant Fifth Amendment protection. *See Fisher v. United States*, 425 U.S. 391, 411 (1976) ("It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment"). While in certain limited circumstances complying with a summons or subpoena may violate an individual's Fifth Amendment rights, see *id.* at 410-13, "the testimonial aspect of a response to a subpoena *duces tecum* does nothing more than establish the existence, authenticity, and custody of items that are produced." *United States v. Hubbell*, 530 U.S. 27, 40-41 (2000). For where the existence, possession and authenticity of the documents are "foregone conclusion[s]" the summonsed party's act of producing the documents does not "rise[] to the level of testimony within the protection of the Fifth Amendment." *Fisher*, 425 U.S. at 411; *Doe*, 465 U.S. at 614 n.13.

Here, as demonstrated above, Mr. Greenberg does not face a real and substantial hazard of incrimination. Thus, the Court's inquiry may end there, and he should be ordered to produce whatever responsive documents he has. But assuming, *arguendo*, that the Court finds that

---

of court. (*Id.* at 131-33.) After several admonitions, Mr. Greenberg complied with the Court's order and testified at length to questions from counsel regarding his involvement in the *Bergmann* SOS-type tax shelter. (*Id.* at 133-195.)

12

Respondent does face a real and substantial hazard of incrimination, it is highly unlikely that the mere existence, possession, or authenticity of the records Mr. Greenberg may possess would tend to be incriminating.  Indeed, the IRS is already aware of the existence of the transactions that took place, including the suspected two tax shelters, and is aware that Mr. Greenberg may have been involved in them.  It is also hard to see how Mr. Greenberg's acknowledgement of custody or authenticity of any of these documents would tend to incriminate him.  At all events, a blanket refusal to produce documents — as occurred here — is inappropriate.  *See Argomaniz*, 925 F.2d at 1355.

## CONCLUSION

In sum, the IRS summons complies with the requirements of *Powell*, and are substantiated by the Declarations of Revenue Agents Ng and Roginski.  Mr. Greenberg's claims of possible self-incrimination do not preclude the enforcement of the summons.  As such, this Court should order Mr. Greenberg to produce all responsive documents and to appear and give testimony, pursuant to the IRS summons.

Respectfully submitted,

JOHN A. DiCICCO
Principal Deputy Assistant Attorney General

<u>/s/ Philip Schreiber</u>
PHILIP M. SCHREIBER
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 14198
Washington, DC 20044
Telephone:    (202) 514-6069
Facsimile:    (202) 514-9868
Philip.M.Schreiber@usdoj.gov

Of Counsel:

WIFREDO A. FERRER
United States Attorney